The last case for the morning is United States v. Batara-Molina, 21-8079. Counsel for the appellant, if you would make your appearance and proceed, please. Good afternoon, Your Honors. Josh Lee from the Federal Public Defender's Office for the... Could you speak into the microphone, please, a little louder? Yes, thank you. Josh Lee from the Federal Public Defender's Office for the appellant, Mr. Molina. The question presented in this case is whether a traffic stop violated Rodriguez v. United States. And that question involves two sub-questions. First, whether the officers prolonged the traffic stop. And second, whether reasonable suspicion supported the officer's decision to pursue a drug investigation. On the first issue, Mr. Molina's traffic stop was prolonged. Deputy Coxville stopped Mr. Molina for speeding, but rather than diligently pursue the traffic-based mission of the stop, Deputy Coxville deviated from that mission to gather up his drug dog and have it sniff the car for drugs. This ended up prolonging the traffic stop within the meaning of Rodriguez because during critical moments, the only other officer on the scene, Deputy Rhodes, was also assisting with the drug investigation and not pursuing the mission of the stop. On the second issue, and contrary to what the district court found... So how much time was involved in that? How much delay did that involve? So the illegal detention was between 25 and 30 seconds. Those are the times that both of the officers were off task. That was enough under a substantial body of this court's decisions, most recently in United States v. Frazier, where the court said that Rodriguez is a bright-line rule and that even a de minimis delay... So is that time, in addition to time that the defendant was instructed to roll up the window, get out of the car, and walk a substantial distance down the road? Those requests seem to be unrelated to the traffic stop. Is that the only time you're talking about, or are you talking about some other delays in addition to that? No, those are the delays that we have challenged because during that time, Deputy Coxville was readying his drug dog and performing the sniff. So it was specifically the time getting out of the car to roll up the window and walking back an extended period of time, not just on the side of the road, but walking backwards long enough to let the dog be cleared to examine the car. Exactly. Those are the three moments that we contend prolonged the stop. Could I focus on the rolling up the window? Yes. What purpose do you allege... Was there a traffic stop-related purpose to the direction to roll up the window, in your view? Absolutely none. There was testimony from Deputy Coxville. This is page 50 of volume 3 of the transcript, where he says, I know my dog, and I don't want my dog to put its head in the windows, and that's why we have them roll windows up. In fact, the government admits in their answer brief, and I don't have that site with me, they admit that this was actually related to the dog. And that's important because even though this delay of getting Mr. Molina to roll his windows up was momentary, what Frazier says is, what we're looking for is a Rodriguez moment. A moment when there are concrete steps taken to further the criminal investigation, and no one is working on the traffic stop. What Frazier also said is, once you find a Rodriguez moment, and this was a Rodriguez moment, the detention is illegal from that point forward. So once he directs Mr. Molina to roll up the windows in the car, and Mr. Molina does that, the detention is illegal from that point forward, the dog sniff occurs during the illegal detention. So that's why there was a Rodriguez violation. Now, the way that the government defends the rolling up the windows moment is, they say, well, look, Deputy Coxfield is going to sniff the car, going to have the dog, I'm sorry, going to have the dog sniff the car, going to have Champ sniff the car. And so Deputy Rhodes can do two things. He can either let the windows stay rolled down, and let the occupants of the car be exposed to this apprehension dog, who could bite them, or he could tell them to roll them up, and we shouldn't punish him for pursuing safety. But this gets everything backwards, because we assume that the deputies are not supposed to be doing a criminal investigation. So they're not being punished for promoting safety, they're being, we do suppression, because they're not supposed to be doing a criminal investigation, and rolling up the windows would not have been necessary, had they not been doing the dog sniff. In other words, the fact that, in your view, the fact that there was, if there was a safety motivation, it was a safety motivation linked to the fact that they were undertaking a separate criminal investigation. That's exactly right. And what Regan has said specifically, is that safety precautions taken in order to facilitate a criminal investigation, are a prolongation of the safety. Well, so let's focus then on the criminal investigation, because the alternative argument advanced by the government was that, there was reasonable suspicion for this detour. And therefore, we can just justify it, not as a traffic stop, but as a reasonable suspicion examination of a felony crime going on. So that's, I think that's where I'd like you to focus a little bit, because to me, I really kind of agree with your first statement. It's the second one that's a troublesome one for me. So I think based on what Deputy Coxville knew at the time, everything that he learned was consistent with Mr. Molina, taking a road trip during the height of the pandemic, when lots of people who didn't otherwise take long road trips, to visit family for at least a couple of nights and to come back. There's nothing unremarkable. There's nothing remarkable about that. How about the third party rental? Which we have a number of cases where that is, it's remarkable only in the sense that it's indicia of drug trafficking. Two points. The first point is there are lots of reasons for third party rentals, most notably that if you have poor credit, you're probably going to need to have someone else rent a car for you. Well, I'm not going to plumb the depths of what the reasons are for third party rentals. All we're talking about is whether there's reasonable suspicion here, which is even less than a fair probability, which is probable cause. So the fact that he had a reason that's connected to drug trafficking, he didn't need to have multiple encyclopedic other reasons that he factors into the equation, does he? So this court has never said that the third party rental, without other substantial factors, is enough to clear reasonable suspicion. Well, let's talk about the other factors then. You've got a travel of a long distance stay with a quick turnaround on the vehicle. I mean, it's like they're traveling across the country for the, quote, vacation, and yet they've got to return the vehicle in a short period of time. Why isn't that odd consistent with our case? I don't think it's at all odd. His travel plan was to travel and stay two nights with family members and then come back. I don't think this court has ever said that a travel plan of staying somewhere two nights is odd or unusual. But more importantly, this court said in Simpson that travel plans that strike us as inconvenient or unusual don't contribute anything to reasonable suspicion, zero. The only thing that contributes to reasonable suspicion, and this is from the court's decision in Lopez, is when the travel plans beg credulity, when it begs credulity that the purpose of the trip could justify it. And here, again, taking a long road trip during the height of the pandemic to visit family for a couple of nights is not even odd or unusual, much less bizarre and begging credulity. How about the odor? The odor. Yes, in most situations, smelling a strong odor that can be used to cover the scent of drugs can contribute to reasonable suspicion, but not here. And that's because Detective Coxbill gave vague and contradictory accounts of what it was that he smelled. He said once that it was the fruity output of a vape device, another time that it smelled like a new car, other times that it smelled like perfume. And the problem with that is not just that they're contradictory, but also that a lot of the smells he listed are totally innocuous. This is in 2020. It's a 2020 rental car. It's going to smell like a new car. They had vape devices in the car. If they're vaping, there's going to be an odor from a vape. And unlike in a lot of this court's cases, neither of the deputies testified, oh, we smelled a new car smell, and people often use a new car smell to cover the scent of drugs. So really, in connection with Deputy Coxbill's testimony, he testified about the cover odor, right? Yes, he said, I smelled a cover odor. It was either a vape or perfume or a new car. Well, wait a minute. I thought he, in the connection with his testimony, as opposed to his report, I understand his report, he talked about smells sweet, all that kind of stuff. But in his testimony, that was consistent with him speaking about it being a cover odor. And even actually in real time, didn't he talk to, say to the other deputy that he thought there was a cover odor? He did. But the problem with this, so let me back up one second. He contradicted himself at the hearing when he said it's a perfume and a new car. And then he's like, I don't know what I smell. But the problem with relying on him saying, I smelled a cover odor, is it's the equivalent of him just saying, I smell something that I thought was suspicious, which that's not particularized and specific enough. In this context, why isn't it? I mean, is it suspicious of what? I mean, obviously dope. I mean, you don't use the word cover odor, but you're covering something. Why isn't that dope? Again, by saying a cover odor, he's just saying, I thought it was a suspicious smell, which is equivalent to this Supreme Court case in Brown that I cited where the officer said, I saw something suspicious in the alleyway. And the Supreme Court said, you have to give details of what it was. Well, we do have the details. We do have the details, and they're a bit unusual. I mean, a lot of people have smell fresheners in their car, but here he described it as strong and is very overwhelming. And that to me is a pretty compelling piece of evidence, because you would not think it would be very suspicious for a person to travel in a car in which there is a very overwhelming artificial smell in the car. And so to me, that one may be the most persuasive to me is that very overwhelming conclusion. We don't have any reason to think it's an artificial smell. Let me let me give you an analogy. What happened here is if Deputy Coxville said, I saw something in the console of the car. It was either a marijuana cigarette or it was an ink pen or it was a toothbrush. I'm not sure what it was, but it was suspicious. That's exactly what we got here, and that can't count for anything. And I'd like to reserve the remainder of my time with the court's late. Of course. Good afternoon, my name is Jonathan. I'm a resident of the United States in the District of Wyoming. Judge Ebel, can you hear me all right? Counsel, we have a conflicting testimony apparently about how overwhelming this evidence was. Can the officer take the most incriminating statement of that and say very overwhelming? That is something you probably wouldn't want to have in the car. Or do do we have to do we do we say, well, you can't rely on that officer. I'm not sure I understand your question. I'm going to attempt to answer it. The way this case presents to the court here today, Your Honor, is the government obviously prevailed with the motion to suppress. And while the standard of review is de novo on the question of whether or not there was reasonable suspicion, the facts themselves are not being tested. And those facts are supposed to be viewed in light most favorable to the government. So at a minimum, my position, Your Honors, would be that this court is not going is not supposed to under that standard of review, under that view of the facts, is not supposed to try to find the most innocent explanation for every single one of these facts in the record. That certainly would not be viewing those facts in the light most favorable to the government. Well, yes. But what about the fact that there's inconsistent testimony or statements by Deputy Coxville about what he discerned in connection with the vape? I mean, you know, we have the cover order odor testimony, but we do have the testimony about fruity smell and and that kind of thing. And I mean, people who vape cigarettes, I think that there is a fruity smell. And so or some of them anyway. And so what I guess the the thing that I want to get at is two things. If although we're construing the facts in the light most favorable to the to the government, if there are conflicting facts, what is supposed? And there is no explicit finding from the district court as to one set of facts or the other. What are we supposed to do with that? Respectfully, Your Honor, I don't actually think there is conflicting testimony about the odor itself. All right. Why not? Mr. Lee supplemented the record with Deputy Coxville's report. That was not an exhibit at trial. Now, what he test or not a trial at the motion to suppress what Deputy Coxville testified to is this cover odor. But he wasn't really sure what it was, which is exactly why he called it a cover. He wasn't calling it a new car smell. He wasn't saying that was for sure perfume. He was calling it a cover order because he didn't really know what it was. But it struck him as suspicious. In his own words, as he said, it was overwhelming. And Judge Holmes, Your Honor, I think you're right on point in that there is this sort of conflicting statement in this report, which he didn't really get a chance to explain at the hearing where he attributes it to a vape. He didn't do that at the motion to suppress. And more importantly, as you pointed out. OK. And just to be clear, because perhaps I was operating under a misimpression here. The comments that were that report was not before the district court when it made its suppression determination. It was not an exhibit. My recollection, I was there was that. And I think the record would reflect this. Deputy Coxville was asked by the defense attorney about. Didn't she say this was a vape? And Deputy Coxville said something like, I don't remember saying that. I don't think I did. I'm obviously paraphrasing that. But at the hearing, he did not attribute it to the vape. At the hearing, he said it was the cover odor. Right. He could not identify specifically what that scent was. That's why he called it a cover odor. What I was trying to point out is you're exactly right. In real time, his body cam, when he walks back to the car and he's going to start filling out that warning. The first thing, one of the very first thing he says that he wrote is getting like a really good cover. So, you know, that he didn't attribute it to the vape. And at that moment, he didn't know what it was. But it struck him as a cover odor. OK, cover. Well, that's the point. I mean, I engage in that colloquy with opposing counsel. But to to the point, was there did he say what he discerned that cover odor to be? I'm not saying kind of drug, but was he saying it was a cover odor for in his view? And we're talking suspicion now because did he suspected it was a cover odor for narcotics? Did he say that at the hearing? I don't think he said that at the hearing. I think the inference is absolutely there. If it was just a strong odor, I don't think he would have pointed out to Deputy Rhodes. And he wouldn't have called it a cover odor because that's what cover odors are. There was a special agent, Jason Ruby, who testified, testified about the sorts of things law enforcement looks for. Cover odors being one. That's a technical term. OK, well, work with me on this then. Let's let's talk about the potential reasonable suspicion framework here. What what what is wrong with opposing counsel's position that that the travel plans here were not remarkable at all? I mean, that, you know, as he put it, middle of the pandemic, he wants to go visit family. And and so he does that with a with a quick turnaround, relatively quick turnaround. But the fact that it's a unusual travel plan, why is that indicia of narcotics trafficking? When it gets here to answer your question, the very first thing I'll say is this. This court has said over and over that any one of these sorts of things by itself will never be reasonable suspicion. It's once you start to get a grouping of suspicious activities where you finally get reasonable suspicion. Well, I get that. But he is he alluded to a case which he said made this zero. And if it's zero, zero in an aggregation will do nothing for you. And so I so explain that to me. Bizarre and inconsistent travel plans absolutely can lead to reasonable suspicion. And we have those here. So Debbie Coxville. One of these testified, they understood California, South Dakota, they didn't know the exact mileage. It turned out, turns out the round trip was like over 3000 miles. They know the exact mileage, but they knew it was a really far way to go. And Mr. Molina, the rental car was due back two days. He hadn't even made it to his final destination yet. When he was asked about that, he then changed the story. Now, it wasn't, oh, and he's back in two days. It was I'm going to extend. But of course, Mr. Molina, he could not extend the rental. It was a third party rental. He had no ability to continue or extend that that rental agreement as a matter of law. In fact, the agreement itself no longer existed. He had violated the rental agreement driving vehicle. And it was gone out the window. Deputy Coxville, of course, didn't know that at the time. But we know as a matter of fact, he couldn't have extended the rental. More than that, your honors, he was in a vehicle. I think it was probably with romantic interest. And he had slept at a gas station the night before. That was something else that he shared. He had slept at a gas station. So this provided law enforcement the perception, one that I think is very reasonable, they were traveling hard. And what we know from drug traffickers, mules in particular, that's exactly how they travel. They stay overnight in hotels. They make the trip quick. They're in back again. So this was exactly like what we see in drug trafficking. In fact, I have is he did he did he specifically say he had relatives in Sioux Falls? You know, that's not my recollection. I trust Mr. Lee. I don't think he's representing the court, so I don't know for sure that wasn't my recollection. For some reason, I didn't tumble to that. Maybe it's true. But I didn't tell him the fact that he said I have I have relatives because that would have had a follow up question. Well, who were they? And I don't think anything like that was in the record. So I'm not I'm not sure that he said that. I thought he just never explained why he wanted to go there other than to visit. My recollection is not that he's going to travel relatives, but let's assume for one moment that is in fact what he said. I'm going back to Judge Holmes point that just raises the reasonable suspicion even further for this one simple reason. If you're traveling to see your relatives who are, I don't know, about 1500 miles away. Is it likely, you know, where they live? Because Mr. Molina, when he was asked where he was going, responded Seahawks Falls. He mispronounced Sioux Falls. I thought he said something completely different, but I don't see that he said Seahawks Falls. So this story that he would be traveling to visit family in a place he can't pronounce absolutely lends itself to reasonable suspicion. I find the mispronunciation thing pretty darn weak. I mean, the reality is there are a lot of people from different heritages who can't pronounce Sioux Falls. I mean, if you do, if you give you a number of places in Oklahoma and I'll dare you to pronounce them correctly. I mean, and so I don't know. That doesn't do anything for me. I mean, let me focus for a second here. And the question of sleeping in a gas station. What has to give all of us some concern here, I think, is there are poor people out there who travel. You know, that doesn't make them drug traffickers. And why does it automatically lead one to believe that they're doing anything other than what he said he's going to do? He's visiting some people. He has to get back. What I want to focus on for a question is for a moment is your suggestion that he changed his story, because I don't recall that. So what did he say initially about the rental? I'm going to, you know, putting aside the mispronunciation, I'm going to Sioux Falls for a travel, for a vacation. How did he change his story? That's a fair, that's a fair point. I don't recall the exact dialogue. What I will say is I believe he was asked what they were doing. And he said him, I'm going for a vacation, to which it was then pointed out to him. That's pretty quick vacation. This car is due back in two days, to which he then has. Okay, about the. Okay, yeah, I'm going for vacation and I'm going to extend this rental car. Okay. So it was inconsistent with what was provided. Well, it was just vacation, then that is not the same as visiting relatives. I mean, I was surprised about that statement about visiting relatives, because I think it would have had follow up questions, which not aware of. Yeah, your honor, my recollection is that it was more like for vacation. My perception is that it was sort of like romantic in a way with his girlfriend. Since we have a little bit of time, why don't we talk about the rolling up the car window? I understand the argument that was made in your brief about safety. What I don't understand is why isn't that argument pretty darn problematic? I mean, it's one thing to say I commend the officer for being concerned about the safety of the passenger. But if the reason that they were concerned about safety to begin with is because they were going to conduct a drug investigation, which involves the dog sniffing the vehicle, if we're not in the realm of reasonable suspicion now. Why aren't we? Because that's a problem, isn't it? Certainly. So let's talk about the car windows, obviously. Before I do, let me point something out. I observed the defense attorneys love to quote the case and say a de minimis delay, even a de minimis delay violates the Fourth Amendment. There's something in there that has to be added, an unreasonable de minimis delay. Because reasonableness we know is the touchstone of the Fourth Amendment. So an officer who sneezes and has to stop writing his ticket, that's a de minimis delay. Well, if they're sneezing to pursue their criminal investigation, then that's a problem, isn't it? We talked about Rodriguez moment. That means moment. And if there is that moment in time and when one officer is going to crank the window, other officers get in the dog, and the only reason that window is being cranked is in anticipation of the dog sniffing for dough, then why isn't that a Rodriguez moment? So it's not clear to me that he was actually ordered to roll his windows. I think that the exact quote is, I'm going to help you roll up your windows, and Molina agrees to do it. He doesn't say roll up your windows right now. The other thing that I want to say. And the legal significance of that being what? Because what we're talking about now is the period of time in which the law enforcement officers were focused on something else. Whether they told him to roll up, whether they told him, or ordered him to roll up the window, or whether they asked him to roll up the window, the point is, what's their objective at that moment in time? If their objective is to pursue their traffic investigation, whatever reason that could be, then that's one thing. But if their reason is, I'm getting ready to use my drug sniffing dog, that's a problem. So, Deputy Coxville was absolutely engaged purely in a drug investigation at that moment. Deputy Rhodes was not engaged in the investigation. Deputy Coxville handed off his clipboard and said, hey, will you please go and verify his address? There was a mounting testimony about why that is important to the purpose of the traffic stop. He asked Deputy Rhodes to either get him to roll up his window, ask him, or order him, right? He said have him roll up his windows and get him out of the car. Okay, so whether Deputy Rhodes knew why he was doing that or not, what he was doing was pursuant to what Deputy Coxville was doing, which was pursuing a drug investigation. I think it's important that we know people can have competing reasons for doing something. And I note that Mr. Lee, he filed a subpoena with this court. And that case was United States v. Whitley. It's not binding press inside the Sixth Circuit. There's actually a case embedded in that. The case that is embedded in that, in fact, is United States v. Lash. And what's interesting about that case is they're a law enforcement officer. He approaches a vehicle, and he actually tested it on the stand. He said, hey, I honestly didn't think this was worth writing a citation. But while he's up there, he sees a bag hanging out of the guy's pants. And that alone made him say, hey, I'm going to now continue my traffic stop. Now, obviously, he had two motivations there. The traffic stop itself, but he obviously was also investigating something else. So turning back to Deputy Rose, Deputy Rose, yeah, he was told to go over that window. We know that was only for the safety of the passengers when he left behind. But he never deviated from trying to issue that warning. And I made this analogy at the hearing. You know, if the four of us were asked to do one task, mow the lawn as a game of light, we're all going to do it a little bit differently, but it doesn't make it unreasonable that we did it differently. The difference is, let me for the moment spot you on this business of having two motivations. But the difference here is in that there was give or give me one. It seems to me there is no motivation that is related to the traffic stop involving the rolling up of that window. That could have been done. There was nothing that facilitated the traffic stop that involved rolling up that window. And if that's so, it doesn't matter if they were going to continue doing the, you know, the giving, writing the ticket. The question is, when you told him to do that split time moment, when you told him to do that, were you doing that because I need to have him roll up the window to facilitate the traffic stop? Or were you doing that because you were told by somebody who was pursuing a criminal investigation? Seems pretty much like the latter. Why isn't it? I don't think rolling up the windows facilitates the drug investigation. Coxpill said it did. It's safety, right? And why is that? Because the dog is going to go up there and sniff for narcotics. But it doesn't make the dog more effective. There was no testimony that it makes the dog more effective. It doesn't make the odor more concentrated so that the dog is more likely to hit. The point is in efficacy. The point is attention of officers from either the traffic stop or from a drug investigation. They could be doing a lousy drug investigation, but if they're focusing on the drug investigation, as opposed to the traffic stop in that split moment in time, what difference does it make? Well, apparently the officer that said roll up the window, was he the one that also should have been spending his time on the traffic stop? No, the officer said roll up the window at that point handed off the clipboard. So now Deputy Coxpill was the one who's the canine handler. He's the one who said roll up the window. He said that to Deputy Rhodes who at that point had taken over the responsibility for finishing the traffic stop. Well, what did the person who was watching him roll up the window and walk back with him after that, after he exited? Was that the person who was writing up the traffic ticket? No. So Deputy Rhodes who had the clipboard at that point- So how do we know that he had delayed the traffic ticket at all? I apologize. I didn't understand what you said. Please repeat that. If the traffic ticket was being written up by the other officer who stayed behind, how do we know that the fact that Rhodes said roll up the window and walk back off the car, delayed the writing up of the ticket at all? I thought that Rhodes, the guy who was doing the window demand and the walking back, I thought he was the one who was supposed to be writing up the traffic ticket. I think you have a couple of the facts confused and I'm certain I have not helped it. Deputy Coxbill made the stop. He then handed the clipboard off to Deputy Rhodes. Deputy Rhodes went to the driver's side and he was then standing in the middle of the road, because Rhodes and Molina had parked, asked him to exit the vehicle and come back to the shoulder. They would be outside of traffic. Right. So yeah, I think- But was it Rhodes or Cox that was writing up the traffic ticket? It was Deputy Rhodes once he got to the shoulder and began to confirm his address, Your Honor. Then he wrote up the traffic ticket, so it did delay the writing up of the traffic ticket, because Rhodes was doing something else before he wrote up the traffic ticket. Which specific thing, Your Honor? I see you're already into your time, so that's enough. Thank you. Well, thank you, Your Honors, and it's good to see you in person. Indeed. Thank you, Counsel. All right. I know you had some time and we gave him more time. Let's just round it out, three minutes, and call it a day. Harry, three minutes. Thank you, Your Honors. I don't think I will take the full three minutes. I have three quick points I want to make about the record. One, Defense Exhibit H was presented to the District Court at the evidentiary hearing. That's at volume three of the record, page 35. That's the report. That's the report. Second, and this is related, Mr. Molina did tell Deputy Coxfield when questioned about Sioux Falls that he has family there. That was in Deputy Coxfield's report. It's at page five of the supplemental record, which, again, is Defense Exhibit H. The last thing is, and also about the reasonable suspicion, is that my colleague mentioned things like that Mr. Molina was not entitled to extend the rental agreement, that by driving on it he negated the rental agreement, that it was over a 3,000-mile trip. None of that stuff was known to Deputy Coxfield at the time. That was testified to by Special Agent Ruby, who testified after the fact. I'm not even sure why the District Court allowed that testimony. It's totally irrelevant to the reasonable suspicion. So I would ask that you reverse Mr. Molina's conviction and remand with instructions that the District Court suppress the evidence. Thank you, counsel. Thank you for your fine arguments. Case is submitted.